No. 26,380.

LIZZIE B. CUSHENBERY, as an Individual and as Trustee for J. L. McCABE and F. DUMONT SMITH, *Appellant,* v. THE WAITE-PHILLIPS COMPANY and THE ALCORN OIL COMPANY, *Appellees.*

No. 26,381.

LIZZIE B. CUSHENBERY, as an Individual and as Trustee for J. L. McCABE and F. DUMONT SMITH, *Appellant,* v. THE WAITE-PHILLIPS COMPANY and THE ALCORN OIL COMPANY, *Appellees.*

No. 26,382.

LIZZIE B. CUSHENBERY, as an Individual and as Trustee for J. L. McCABE and F. DUMONT SMITH, *Appellant,* v. THE WAITE-PHILLIPS COMPANY and THE ALCORN OIL COMPANY, *Appellees.*

No. 26,383.

LIZZIE B. CUSHENBERY, as an Individual and as Trustee for J. L. McCABE and F. DUMONT SMITH, *Appellant,* v. C. G. BRADY, J. R. BRADY, OWEN A. WOOD, Trustee for OWEN WOOD POOL No. 3, for the Use and Benefit of Certificates of Interest Therein, *Appellees.*

SYLLABUS BY THE COURT.

1. WATERS—*Specified Acreages—Accretion—Ownership.* Where lands adjacent to a meandered stream were patented by the government in terms of specified acreages in lots of fractional sections in accordance with the original government survey, whoever holds title under such patents is, by operation of law, owner of whatever lands may have been added by accretion to the original surveyed and patented acreage; and the rule that prevails in some jurisdictions that there is only a rebuttable presumption that accretions are included in an instrument describing the lands in terms of government survey does not prevail in this state.

2. BOUNDARIES—*Controlling Elements.* A surveyor's meandering line along a river bank is not a boundary line of a tract of land; the river bank is itself the boundary line.

3. MINES AND MINERALS—*Oil and Gas Lease—Description of Land.* There is no distinction as to the legal effect of a description of land whether such description appears in an ordinary deed of conveyance, an oil and gas lease, or otherwise.

4. SAME—*Oil and Gas Lease—Accretions—Reformation of Lease.* In an action between rival lessees of oil and gas leases executed by common lessors, arising from their conflicting rights to certain lands adjacent to the Arkansas river formed by accretions, where the senior lessees held under contracts

1. Waters, 40 Cyc. p. 624. 2. Boundaries, 9 C. J. § 69. 3. Mines and Minerals, 27 Cyc. p. 726. 4. Id., 27 Cyc. p. 726; Evidence, 22 C. J. § 1503; Reformation of Instruments, 34 Cyc. pp. 913, 988.

leasing to them all the lands owned by the lessors as defined in the lessors' government land patents, and the junior lessees held under contracts all the lessors' accredited lands lying between the meandered boundaries of the Arkansas river as they existed when surveyed by the government in 1871 and patented to the lessors and the Arkansas river as it now is located, the record examined, and *held:* (*a*) That the prior leases covered the accretions; (*b*) that the prior leases were unambiguous and not subject to alteration by parol testimony; (*c*) that there was no evidence of such mutual mistake or fraud as would permit the prior leases to be reformed; and (*d*) there is no rule of law or equity which will sanction an alteration of a written instrument for the reason that some of the parties thereto were mistaken as to the legal effect of the language of the instrument to which they gave their assent.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed October 10, 1925. Affirmed.

*Chester I. Long, J. D. Houston, Austin M. Cowan, Claude I. Depew, James G. Norton, W. E. Stanley,* all of Wichita, *F. Dumont Smith* and *Eustace Smith,* both of Hutchinson, for the appellant.

*T. A. Noftzger,* of Wichita, *Albert Faulconer, Kirk W. Dale, C. L. Swartz,* all of Arkansas City, *Chas. W. Roberts,* of Winfield, *E. C. Mead,* of Tulsa, Okla., *Wade H. James,* of Okmulgee, Okla., *H. E. Oakes* and *W. K. Moore,* both of Ponca City, Okla., for the appellees.

The opinion of the court was delivered by

DAWSON, J.: These four lawsuits involve the interests of rival lessees holding under oil and gas leases executed by common grantors, and chiefly relate to a considerable acreage of accreted lands lying between the meandered lines of the west bank of the Arkansas river as of the time of the United States government survey in 1871 and the river bank as it is now located.

The grantors of the leases were A. P. Douthitt, Ike E. and Robbie Nelson, Ben Thurlow and W. E. Holman. These grantors are the owners of certain lands lying alongside the Arkansas river in Cowley county. The Arkansas river thereabout is a meandered stream and the government patents to the lands involved specify certain definite acreages in lots of fractional sections, instead of the typical section and quarter-section numbers which prevail in government surveys unaffected by the proximity of streams of sufficient importance to justify their being meandered.

The specified acreage of the original surveys made in 1871 and the land patents issued in accordance therewith bear little relation to the actual acreage pertaining to these lots at the present time.

The reason for such disparity lies in the character of the banks and bed of the Arkansas river. Like most of the prairie streams of this state, the soil is either loam or sand, and alluvion and dereliction make changes in the course and contour of the river banks with much greater rapidity than where streams flow through sterile and rocky soils. The present cases give good examples of these physiographical phenomena. Thus in case No. 26,380 the lessor of the plaintiff, A. P. Douthitt, holds in fee lots 6 and 7 in section 17, township 33 south, range 3 east of the sixth principal meridian, in Cowley county. These lots lie west of and adjacent to the Arkansas river, each lot having the meandered river bank as one of its boundaries. Lot 6 calls for 35.60 acres according to the government survey of 1871 and according to the land patent under which Douthitt holds. By accretion and dereliction that lot now contains 51.75 acres. Similarly, lot 7, which called for 14.30 acres in 1871, and was patented accordingly, now contains 36.06 acres. Similar differences now exist between the actual acreages owned by the other lessors, Silas Thurlow and W. E. Holman, and those defined in the original surveys and specified in the patents under which these lessors hold title. To a much less extent the same is true as to the lands of the lessors, Ike E. and Robbie Nelson.

In January, 1923, Douthitt, the Nelsons, Thurlow and Holman granted to certain assignors of the defendants leases to prospect for and develop oil and gas on their lands. The lands described in these leases are in literal conformity with the descriptions of the original government survey, with the descriptions in the original land patents, and in accord with the legal descriptions and acreage upon which the lessors have paid taxes since the lands were patented many years ago.

None of the lessors had ever used or improved these accreted lands; nor had taxes ever been levied or paid thereon except as in legal effect such taxation might or should be so construed from the regular annual payment of taxes on the lands to which these accretions had attached.

Some months after the first leases were given to defendants' assignors, oil had been found on or near these lands, and following such discovery, in December, 1923, and in January, 1924, the above lessors gave to the plaintiffs leases on their accreted lands lying between the original meandered lines of the Arkansas river as surveyed in 1871 and where the river is now located. This the lessors

Cushenbery v. Waite-Phillips Co.

did, as they alleged and testified, on the theory that they had not leased all their lands in January, 1923, to defendants' assignors, but only the actual acreage called for by the original United States surveys, and that in making their several oral contracts with defendants' assignors they had expressly reserved and intended to reserve whatever lands might inure to them through accretion over and above what they held by record title and on which they paid taxes. In the prior leases to defendants, and by certain escrow agreements, the latter obligated themselves to pay the lessors $1 per acre for all the lands leased to them. The Douthitt lands leased to defendants were specified to be 131 acres, and for which defendants have paid at the rate of $1 per acre per annum, $131. The actual acreage of the Douthitt lands, including the accretions to lots 6 and 7 mentioned above, is 175.76. The Nelson lands, similarly leased to defendants at $1 per acre, were specified as 84 acres, and for which defendants have paid annual rent at $84, actually constitute 85.53 acres. The Thurlow lands, leased to defendants at $1 per acre, were specified as 352 acres, and for which defendants have paid annual rent at $352 actually constitute 442.87 acres when the accretions are included therewith. The Holman lands, leased to defendants, were specified as 312 acres, for which defendants have paid rents at $304, actually comprise 358.14 acres.

The plaintiffs' leases cover the lessors' accreted lands, viz.:

Douthitt accreted lands ............................ 44.76 acres
The Nelsons' accreted lands........................ 1.53 acres
Thurlow accreted lands ............................ 90.87 acres
Holman accreted lands ............................ 46.14 acres

Included in plaintiffs' leases, also, the lessors gave plaintiffs a right to explore for oil and gas in the bed of the Arkansas river between the present river bank adjacent to these accreted lands and the middle of the main channel of the stream. Those parts of the river bed which the lessors have assumed to lease to plaintiffs are as follows:

Douthitt ......................................... 16 acres
The Nelsons ...................................... 29.50 acres
Thurlow .......................................... 60.9 acres
Holman ........................................... 43 acres

But touching so much of these lawsuits as arises from the leasing of the river bed, this court will avoid comment because it does not appear to be a vital issue between the parties to this litigation, and because we note that plaintiffs have instituted some sort of a law-

suit in the federal court against certain public officers of Kansas, under some claim of right to mine for oil and gas in the river bed; and these public officers have apparently come to some understanding with plaintiffs touching a disposition of the proceeds or royalties of any oil and gas found therein.

In plaintiffs' actions herein the leases of the accreted lands are set up, and it is alleged that defendants claim all the oil and gas rights thereto by virtue of their earlier leases. Plaintiffs allege that defendants' leases do not cover the accreted lands; that the lessors of the plaintiffs never intended to lease to defendants the accreted lands; and plaintiffs pray that their lease rights to the accreted lands be quieted, and that if the court should hold that as written the defendants' earlier leases do cover the accreted lands, then such leases do not express the mutual agreements of the parties thereto and that mutual mistakes inhere therein which should be reformed, and they pray that the leases be so reformed to recite correctly the several contracts of the parties thereto, and for other equitable relief.

By amendments and supplementary pleadings other allegations of more or less significance were pleaded by plaintiffs, and after certain demurrers and motions were disposed of, defendants answered with a general denial, making certain admissions and allegations, and set up the leases executed to their assignors, alleging defendants' reliance on the recitals therein and the records thereof, and alleging that they had no knowledge or notice of any mistake in the descriptions of the lands leased to their assignors or that their leases did not include the accreted lands, and alleging that at the time defendants acquired these leases they understood and believed they were acquiring all the lands owned thereabout by the lessors contiguous to the Arkansas river without regard to the acreage each tract might contain.

Certain varying details in the four actions appear in the pleadings of the parties which need no mention at this point.

Appropriate replies to defendants' answers were filed. Issues thus joined were tried by the court without a jury. Evidence for plaintiffs was presented *in extenso*, developing all the facts set out above, and at its conclusion defendants' demurrers thereto were sustained and judgment was rendered for defendants in each of the cases.

Plaintiffs appeal, presenting with painstaking care the points on which they rely for a reversal of the judgment. Their elaborate

arguments center about two main propositions: (1) That the defendants' leases covered only the actual acreage specified in the contracts and on which the defendants have paid the stipulated rental of one dollar per acre per annum; and (2) that if the defendants' leases are given a construction which will include the accreted lands of the lessors, such construction is at odds with the contracts intended to be made by the lessors and defendants' assignors, and that defendants had notice thereof and are bound thereby.

Touching the first of these contentions appellants present a formidable array of authorities touching the rebuttable character of the presumption which attaches to the quantity of land which passes in an instrument describing the land in terms of government survey. They concede that there is a presumption that all accretions are included and losses by erosion ignored, and that the call for a stated acreage yields to the actual acreage included in the terms of the government survey; but appellants emphasize the point that this presumption is rebuttable by proof of the true intent of the parties to the instrument. A majority of this court decline to recognize or apply that doctrine to the cases at bar and hold without qualification that the tracts defined by the government survey and described in the government patents under which the lessors hold title include the accretions which have attached thereto since the lessors' lands were surveyed and delimited by the government surveyors in 1871 and patented in accordance therewith. So far as concerns the meandering lines along the river bank run by the government surveyors in 1871, it is to be kept in mind that those meandering lines were not the land boundaries. They were merely mathematical data for calculating the then existing but changeable acreage—no more. The true boundaries of the lessors' lands always were the river bank itself, and such was and is the tenor and legal effect of the land patents under which the lessors of these rival litigants hold title. We have no present concern with legal questions which may arise from sudden changes caused by flood, storm or other unusual agency, as affecting boundaries of riparian lands along meandered streams. (*Wood v. Fowler,* 26 Kan. 682, 688, 689; *Fowler v. Wood,* 73 Kan. 511, 85 Pac. 763, and citations; *Craig v. Leonard,* 117 Kan. 376, 232 Pac. 235.)

In *Peuker v. Canter,* 62 Kan. 363, 63 Pac. 617, where the legal significance attaching to the description in a government survey and land patent was under consideration, it was said:

"Lots 1 and 2, as described in the original survey, were at that time fractional forty-acre tracts bordering on the river. Their shore line was meandered. *The river, not the meander line, was the western boundary. Meander lines are not boundary lines.* (Gould, Wat., 3d ed., § 76; *Kraut v. Crawford,* 18 Ia. 549; *Railroad Company v. Schurmeir,* 7 Wall. 272, 287, 19 L. Ed. 74.)" (p. 368.)

In Gould on Waters, 3d. ed., § 76, cited by the court in *Peuker v. Canter,* supra, the text reads:

"According to all the decisions in most of those states in which the lands were originally surveyed under the laws of the United States, the lines run by the United States surveyors along the river banks are not lines of boundary, the owners of the adjacent lands taking at least to the water's edge, thus giving them the benefit of the river frontage, with the right of access to the river, and the incidents of riparian proprietorship as to the use of the water. The true boundary line of a navigable stream or lake is the point to which the water usually rises in ordinary seasons of high water. The position of that line is a question of fact for the jury, and it controls although the meander line of the survey is found not to be coincident therewith. When landowners once become riparian proprietors they are entitled to the accretions, or newly formed ground which may be left by the river after the survey and sale by the United States of the adjacent land, and which, if not their property, would separate them from the river. The tendency is to accept the decisions of the supreme court of the United States in *Railroad Co. v. Schurmeier* and *Barney v. Keokuk* in those states in which the rule extending the riparian owner's title to the center of the stream had not been previously adopted. These decisions have been followed in Missouri, Minnesota, Arkansas, Oregon, Nevada, Kansas, Florida and California."

See, also, Rose's Notes to *Railroad Co. v. Schurmeier,* 74 U. S. 272, in 19 L. Ed. 592 *et seq.*

It is argued for appellants, and supported by some authorities, that while the foregoing may be the prevailing rule as to the legal significance to be given to land descriptions in ordinary conveyances, they ought not to be so interpreted in oil and gas leases, which are mere licenses to come and go on the property concerned and to explore it for these products and to remove them if discovered. This court holds that such a distinction as to the legal effect of a land description in a deed and in an oil and gas lease is too dogmatical for practical purposes and would introduce a subtlety into our law which would be thoroughly mischievous. A legal description which sufficiently defines a tract of land in terms of government survey, in a government patent, and according to the terms of which the land passes from one fee holder to another and is thus listed for taxation, should be given no variable significance whether that de-

scription appears in a deed, an ordinary lease, an oil and gas lease, or any other instrument in which the property is the subject of any contract or transaction. (*Ratcliff v. Paul,* 114 Kan. 506, 509, 220 Pac. 279.)

Turning next to the error assigned in sustaining defendants' demurrer to plaintiffs' evidence, a majority of the court are of opinion that appellants' contention on this point is also without merit. The defendants' leases were unambiguous and were therefore not subject to alteration by parol testimony; and given its largest significance, plaintiffs' evidence disclosed no such mutual mistake as would permit the defendants' leases to be reformed. The evidence adduced in plaintiffs' behalf went no further than to show that there was a question or doubt in the minds of the lessors as to the legal effect of the recitals of land descriptions in their land patents and in the leases they had given to defendants; and there is no rule of law or equity which will sanction an alteration in a written instrument for the mere reason that some of the parties thereto were mistaken as to the legal effect of the language to which they had set their hands. It therefore follows that the demurrer and plaintiffs' evidence was properly sustained, and the judgment must be affirmed.

DAWSON, J. (dissenting): Laying altogether to one side the many decisions from other jurisdictions which seem to me to support appellants' main contentions, and to which I find no adequate answer in the briefs and arguments for defendants, I am unable to discern a fundamental distinction between the present cases and our prior decisions which hold that in contracts involving land descriptions the calls for quantity will prevail over descriptions in terms of government survey where such was the intention of the parties concerned.

In *Mayberry v. Beck,* 71 Kan. 609, 61 Pac. 191, it was said:

"(Johnston, C. J.:) . . . Complaint is made of the admission of parol testimony, but we think it was justified. The difference between the quantity named in the deed and the other features of the description made a patent ambiguity that warranted the admission of testimony showing the intention of the parties. Such testimony may not be received to contradict the language of the instrument, but to explain latent ambiguities, and to that end it may be resorted to in order to show the situation and condition of the property conveyed, the circumstances under which the conveyance was made, and the practical construction put upon the conveyance by the parties." (p. 612.)

In *Cummins v. Riordon,* 84 Kan. 791, 115 Pac. 568, the call for quantity was forty acres and the legal description in terms of government survey was twenty acres. This court said:

"(Mason, J.:) Although ordinarily the statement of acreage is the least important part of a description of land, it may be controlling when it obviously was the intention of the testator that a specified quantity of land should be devised." (Syl. ¶ 2.)

In the case of *Maffet v. Schaer,* 89 Kan. 403, 131 Pac. 589, it was said:

"(Burch, J.:) . . . The true consideration of a deed may always be shown by parol, and consequently an action for money had and received, accruing to the plaintiff for the excess payment, may be supported by such proof. Again, the written memorandum of sale and the deed did not express fully the agreement of the parties. Those instruments did not embody the agreement respecting the price per acre." (p. 408.)

Why should not this principle be applied to the present cases? Defendant's lease from Douthitt bound them to pay him one dollar per acre for 131 acres. The escrow agreement was to the same effect. The defendants have paid on that *per acre basis.* But the total acreage of Douthitt's land claimed by defendants is 44.76 acres in excess of what they have paid for at the specified price of one dollar per acre. Similarly, defendants claim an excess of 90.87 acres of the Thurlow lands over what they pay for, and an excess of 46.14 acres of the Holman lands. In that situation, why should not the plaintiffs be permitted to prove that the lessors specifically withheld and intended to withhold from the defendants' leases this excess acreage, these "made lands," the lands they *did not know for sure* that they owned, and that *only the lands the lessors knew they could safely warrant the title to and which were to be paid for at the rate of a dollar an acre were intended to be leased?* Neither in the decision of the trial court nor in the briefs of the learned counsel for the defendants, nor in consultation with the justices of this court in our own chambers, have I received a hint as to the reason why the rule of the cases I have quoted from above should not be applied to the cases at bar.

And as to the evidence and its sufficiency to prove the allegations of the petitions, the witnesses for the plaintiffs, chiefly the landowning lessors themselves, may have been a band of unconscionable perjurers and altogether unworthy of credence and the trial court may have disbelieved everything they swore to, in which event this court would find no fault with such a judicial attitude; but even in

that situation the trial court should have rendered judgment against plaintiffs for want of evidence worthy of credence, not on a demurrer to the evidence. (*Reddy v. Graham,* 106 Kan. 339, 341, 187 Pac. 653; *Hinthorn v. Garrison,* 108 Kan. 510, 512, 196 Pac. 439.) The demurrer admitted the truth of all the material matters testified to by plaintiffs which were favorable to their cause and it ignored any inconsistent matters testified to by plaintiffs which were prejudicial to their cause, and in considering the propriety of a demurrer, also, every inference favorable to plaintiffs should have been indulged and given its most potent significance. Thus defendants' demurrer admitted the truth of such testimony as that of Douthitt, the lessor in case No. 26,380, who testified:

"He [defendants' original assignor] said he would give $1 an acre for the lease. I said I would take $1 an acre for it. I leased him the land for $1 an acre. They said they would pay $1 an acre. . . .

"Q. How did you arrive at the acreage? A. I went and got my tax receipts and brought them out. I took the number of acres off of that tax receipt. . . .

"I didn't want to lease nothing only what belonged to me. I hadn't been paying taxes on it [referring to the accreted land], and that is the reason I wouldn't lease it, because I didn't have a clear title. I never paid taxes on it at all—on the made land. . . .

"I put it all in except the made land. I hadn't been paying taxes on it, and that is the reason I would not lease it. They offered to take this [accreted] land, but I would not let them have it. They told me they would take that land. I said that I had not paid taxes on that land and I will not lease that land to you. I told Mr. Baden, or the man who came to get the lease, that it did not touch the river—that the lease did not go to the river."

Thurlow, son of the lessor in case No. 26,381, testified:

"We told him we would [lease] for $1 an acre. We told them we wanted $1 an acre. My father said he wanted $1 per acre for his land. . . .

"We referred to it [the tax receipt] to get the description and also the acreage we had title to and had been paying taxes on. We also referred to it to get the number of acres that they were to pay $1 on. We got the tax receipt and filled it out according to what we had been paying taxes on. There was more land there than what we paid taxes on.

"Q. Was it your understanding that you agreed with Miller and Mabin upon the number of acres as shown by the tax receipt as being the number of acres you owned?

"A. Yes, sir, we did.

"Q. It was your intention to lease that number of acres, was it, and no more? A. It was. . . .

"*I knew there was a warranty in these leases and I would not have warranted the title to the accretions. . . .*

"I spoke about having this extra made land, . . . and they said 'the state will look after that.'

"Q. Was it your understanding that you agreed with Miller and Mabin upon the number of acres, as shown by the tax receipt as being the number of acres you owned? A. Yes, sir, we did. .

"Q. It was your intention to lease that number of acres, was it, and no more? A. It was."

Robbie Nelson, one of the lessors in case No. 26,382, testified:

"They made a proposition that I was to get $1 an acre. . . .

"I got this tax receipt for the purpose of getting the acreage. . . .

"*I knew there was a warranty in the lease. I did not intend to warrant the title to any accretions.* I didn't ever intend to lease the accretions to Mr. Baden. . . .

"Aimed to give them 84 acres; that is all.

"Q. . . . Was it your intention to give them that lot, whatever it might be, more or less? A. No, not by lot, by acres."

Ike Nelson, the other lessor in case No. 26,382, testified:

"I told him I would [lease] if I could get $1 an acre. Miller said he would pay $1 an acre. . . .

"The number of acres I found on the tax receipt was the number of acres which I put into the lease. We put the same number of acres in the lease that was in the tax receipt. . . .

"I intended to put in all I could defend in title. I knew it [the accretions] was not ours by title. *I would not have warranted the title to the made land.* . . .

"I thought we was keeping out all the made land and was leasing exactly all we had a deed for and paid taxes on. I knowed the made land was along the river."

Holman, the lessor in case No. 26,383, testified:

"One dollar per acre was to be paid as rental. The proposition was $1 per acre as rental after the first year. . . .

"We agreed upon the number of acres I considered I owned and upon which I would give a lease; this was the number of acres taken from my tax receipt."

It seems to me that the trial court could not properly concede the truth of all this evidence and yet rule, on demurrer, that it was insufficient to make out a *prima facie* case of mutual mistake, or at least mistake on the part of the lessors, and something less innocent on the part of the original lessees which would have the same legal effect as mutual mistake. (*Huber v. Claydel,* 71 Kan. 441, 443, 80 Pac. 960; *Cox v. Beard,* 75 Kan. 369, 89 Pac. 671; *Atkinson v. Darling,* 107 Kan. 229, 191 Pac. 486; *Haymaker v. Alford,* 109 Kan. 710, 201 Pac. 1112; *Hickman v. Cave,* 115 Kan. 701, 224 Pac. 57.)

Counsel for defendants cite some testimony to which the trial court might attach some significance if it had been weighing all the evidence for the purpose of determining its preponderance between plaintiffs and defendants. For example, Douthitt on cross-examination, testified:

"I remember the time Mr. Roberts and Mr. Mead were out there. It was at the same time my daughter got into the ditch with the automobile. I remember Mr. Roberts said that they understood you had made a lease on what you called the made land to other parties, and that the Waite-Phillips claimed they had a lease on it. At that time I remember of telling them: 'God damn it, Charley, I tell you just how it was. If I owned that land Waite-Phillips has a lease on it, and if I don't own it, and they get me a deed for it, they have a lease on it.'"

This statement, made, as it was, under stress or worry of an accident to his daughter, and long after the leases to his accreted lands were executed, might or might not be entitled to much consideration if the preponderance of conflicting evidence were being tested, but even then it would have to be limited to case No. 26,380 and would be altogether incompetent and irrelevant as to the other cases. But even in case No. 26,380 such testimony should have been totally disregarded when testing the propriety of a demurrer.

It seems to me that defendants realize the weakness of their position, so far as the correctness of the trial court's ruling on the demurrer is concerned, since they stress the concluding remarks of the trial court as a finding of fact in their favor. They seem to hold the view that if the judgment cannot be upheld on their demurrer to the evidence, it could be justified on the trial court's remarks as informal findings of fact. The record narrates the incident thus—the witness Holman was on the stand:

"Q. Did you or did you not intend to give a lease to the accretions?

"(The defendants here objected as incompetent and not within the province of the witness to determine.) . . .

"By the Court: It don't help the court very much—let him answer what he intended to do. It don't help the court very much—let him answer what he meant to do. Seems to me what they intended to do is not very material. Every witness has said he intended to lease all they had. If it was theirs they intended to do it, *but they didn't know it was theirs.*

"A. That's exactly what I intended to do—if I owned the land I intended to lease all of it, but if I didn't own the land I didn't intend to lease it.

"The Court: It all comes down to the proposition, Did they own it? Everyone has said that if they owned it they intended to lease it."

If indeed these concluding remarks of the trial court could be

given the significance of a finding of fact, and judgment had been rendered thereon, it might be possible to sustain it on appeal. But even if they were construed to be findings of fact we could not ignore that part of them in which the trial court also remarked that the lessors "didn't know" the accreted lands belonged to them. Be that as it may, on a demurrer to the evidence the trial court's quoted remarks have no potency whatever unless it might be to show that it did not clearly understand the point on which it was called to pronounce judgment. (*Casualty Co. v. Power Co.*, 99 Kan. 563, 162 Pac. 313; *Rowan v. Rosenthal*, 113 Kan. 604, 215 Pac. 1008.)

I am authorized to say that Mr. Chief Justice JOHNSTON and Mr. Justice HOPKINS join in this dissent.