CHARLES PEUKER v. WILLIAM J. CANTER *et al.*

No. 11,759. (63 Pac. 617.)

1. TITLE AND OWNERSHIP — *Alluvion from the Missouri River.*
Plaintiff is the owner of a forty-acre tract of land which, at the
time of the government survey in 1855, and presumably when the
patent was issued, was separated from the Missouri river on the
west by two fractional forty-acre tracts belonging to defendant.
By erosion of the water a part of defendant's land was washed
away until the river reached the plaintiff's said tract and, by eat-
ing away part of it, left the latter a shore line of about 700 feet.
The river then receded, forming alluvion from the line of contact
with plaintiff's land westward within the original surveyed lines
of the defendant and past the same to the river. This alluvion
also attached itself to what was left of defendant's land. *Held*,
that plaintiff was entitled not only to such alluvion as formed
within his original lines, but also to an equitable proportion of
that formed within the original surveyed lines of defendant's
land, and beyond to the river bank.

2. ———— *Meander Lines Defined.* Meander lines along the
shore of a navigable river represent the border line of the stream,
and show that the watercourse, and not the meander line as ac-
tually run on the land, is the boundary.

Error from Doniphan district court; W. I. STUART,
judge. Opinion filed January 5, 1901. Reversed.

STATEMENT.

THIS was an action in ejectment brought by Charles
Peuker to recover from William and Ella Canter the
possession of certain alluvial lands formed by the
Missouri river, in the process of accretion, in front of
a forty-acre tract owned by him. The tract in con-
troversy contains about 124 acres. The plaintiff's
land, to which he claims the alluvion belongs, is de-
scribed as the northwest quarter of the northeast
quarter of section 30, township 4, in range 22, in
Doniphan county. He has owned and been in posses-
sion of the same for more than thirty years. The fol-
lowing map was received in evidence by the court

below as a truthful representation of the plaintiff's forty acres, the alluvial lands, the old and the present river bed, and the government survey, in 1855:

The evidence on the part of both plaintiff and defendants below showed that the alluvion in dispute was formed by gradual and imperceptible additions to the plaintiff's land (the forty acres above described) by the action of the waters of the Missouri river. It was called and known at the trial as the McLellan land. It was admitted that the defendants below were the owners of lots 1 and 2 in section 30, township 4, range 22. It appeared from the evidence that prior to 1876 the river receded from the northwest quarter of the northeast quarter of section 30, owned by plaintiff Peuker, and also from lots 1 and 2 in the same section, owned by the defendants, and had made a large tract of land west of and adjacent to said lots prior to that time. The defendants offered in evidence a certified copy of a map showing the government survey in 1855. It is printed on next page.

The jury returned a verdict for plaintiff below and made findings in answer to particular questions of fact. Those necessary to be considered are as follows :

"1. Ques. Did the original government survey along the bank of the Missouri river west of the land known as the McLellan land, to wit, the northwest quarter of the northeast quarter of section 30, in township 4, range 22, in Doniphan county, Kansas, cross said described McLellan land? Ans. No.

"2. Q. Did the waters of the Missouri river wash away any part of the said McLellan land? A. Yes."

"4. Q. If the last question is answered in the affirmative, then did the Missouri river wash across any of the land known as the McLellan land, to wit, the southwest corner, washing away ten chains and forty-eight links out of the west line of said forty-acre tract? A. Yes.

"5. Q. Did the Peuker land known as the McLellan land, at one time, and after the meander line of the Missouri river was washed away, have a river front of ten chains and forty-eight links? A. Yes."

Peuker v. Canter.

"7. Q. Is the present river bank in front of the McLellan land one hundred and fifty-three chains and eighty-eight links ? A. Yes."

"16. Q. State the time since which Canter has had the continuous possession of the accretions immediately in front of the Peuker land ? A. In 1885.

"17. Q. Did Canter tell E. A. Miller in substance that he and Saunders did not own all the land they had enclosed by their fence on the bar ; that others owned land in there as well as they ? A. Yes."

·"1.  Q.  Did the northwest quarter of the northeast quarter of section 30, township 4, range 22, in Doniphan county, Kansas, at the time of the United States government survey, border on the Missouri river?  A. No.

"2.  Q.  Did lot 1 and lot 2 in section 30, township 4, range 22, in said county, lie between said tract mentioned in question 1 and the Missouri river at the time of the government survey?  A. Yes.

"3.  Q.  Did the Missouri river, after the government survey, wash away a part of said lot 1 and lot 2 in said section 30, township 4, range 22, in said Doniphan county?  A. Yes.

"4.  Q.  After the survey by the government of the United States of the said lands, did the Missouri river wash away a part of the northwest quarter of the northeast quarter of section 30, township 4, range. 22, in Doniphan county, Kansas?  A. Yes."

"7.  Q.  Did the Missouri river at any time wash away all of lot 1 in said section 30?  A. No.

"8.  Q.  Did the Missouri river at any time wash away all of lot 2 in section 30?  A. No."

The court, notwithstanding the verdict, rendered judgment in favor of the defendants below. This action is assigned as error.

*W. D. Webb*, and *Alcid Bowers*, for plaintiff in error.

*Albert Perry*, and *A. L. Perry*, for defendants in error.

The opinion of the court was delivered by

SMITH, J.:  The forty-acre tract of land owned by the plaintiff in error at the commencement of this action did not border on the river at the time of the government survey, in 1855, but was distant therefrom the width of lot 1, now owned by Canter, on the west. Lot 2, now owned by defendants in error, then bounded the Peuker tract on the south and extended westward to the river bank.   These facts having been found by the jury, we must presume that when the

land was patented by the government the boundaries were the same as described in the survey. (1 Greenl. Ev. §41.) This state of facts presents for consideration the question whether the plaintiff in error, having originally no riparian rights, after the water had washed away a part of the land which separated him from the river, and also a part of his own, and then by accretion restored his original boundary lines, together with those of the defendants in error, can claim title to any part of the alluvion so formed within Canter's original lines, and beyond.

Lots 1 and 2, as described in the original survey, were at that time fractional forty-acre tracts bordering on the river. Their shore-line was meandered. The river, not the meander line, was the western boundary. Meander lines are not boundary lines. (Gould, Wat., 3d ed., § 76; *Kraut v. Crawford*, 18 Iowa, 549; *Railroad Company v. Schurmeir*, 7 Wall. 272, 287, 19 L. Ed. 74.) In the last case it was said:

"In preparing the official plat from the field-notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the watercourse, and not the meander line, as actually run on the land, is the boundary."

According to this established rule, when the western limits of lots 1 and 2 moved eastward as the river encroached upon them, ownership followed the shore-line. Finally, by continued erosion, the forty-acre tract of plaintiff in error was reached. The latter then had a river front of nearly 700 feet on a navigable stream and acquired riparian rights.

In *Gifford v. Lord Yarborough*, in the house of lords, 5 Bing. 163 (a decision cited by the supreme court of the United States in *Jefferis v. East Omaha Land Co.*, 134 U. S. 178, 10 Sup. Ct. 518, 33 L. Ed. 87), it was

decided in effect, that in cases of alternate accretion and decretion the riparian proprietors had movable freeholds ; that is, moving into the river with the soil as it was imperceptibly formed, and then again receding when by attrition it was worn away.

In the case of *Steele v. Sanchez,* 72 Iowa, 65, 33 N. W. 366 (s. c., 2 Am. St. Rep. 233), it appeared that the defendant was the owner of one acre of land lying on the Des Moines river. He became such owner in 1875. After this the water washed away some 20 feet of the bank of the river so that the bed of the stream was changed to that extent, and that part of the land originally purchased was covered with the current of the stream. In front of this land, and in the bed of the river below ordinary high-water mark, but within the meander line of the original survey of the lot of which the land was a part, there was a ledge of stone which could be quarried by the building of dams to change the current of the stream and keep the water out. The plaintiff quarried stone in the river at the place above described under contract with the defendant for which he was to pay a certain price per perch, and payment was to be made by delivering stone to the defendant at one dollar per perch. He delivered the stone for which the action was brought and demanded payment therefor on the ground that the defendant was not the owner of the quarry because it was in the bed of the river below original high-water mark. The trial court instructed the jury that if the stone-quarry was within the original survey line it was the property of the defendant, although the channel of the stream had changed so that the quarry was below the ordinary high-water line; in other words, that the original meandered line of the stream re-

mained as the boundary of defendant's land. This instruction was held to be erroneous. It was said :

"When the original government surveys were made, the Des Moines river was 'meandered'; that is, the banks of the river were surveyed and the lines thereof indicated by corners and distances. The river being then a navigable stream, the then owner of the lot now owned by the plaintiff had no title beyond ordinary high-water mark. The title to the whole bed of the river was in the public. . . . When, by the action of the water, the river-bed was changed, the line of ordinary high-water mark was changed, and the defendant's ownership, or the line of his land, changed with it. The bank of a stream is what retains the water in its channel ; and, if changed either by natural or artificial means, the river-bank becomes the line."

The riparian owner in this state owns only to the bank and not to the center of a navigable stream. (*Wood v. Fowler*, 26 Kan. 682 ; *Perkins v. Adams*, 132 Mo. 131, 33 S. W. 778.) In *Welles v. Bailey*, 55 Conn. 292, 10 Atl. 567, a well-considered case, in which elaborate briefs were presented, the court, at page 316, said :

"If a particular tract was entirely cut off from a river by an intervening tract, and that intervening tract should be gradually washed away until the remoter tract was reached by the river, the latter tract would become riparian as much as if it had been originally such. This follows necessarily from the ordinary application of the principle. All original lines submerged by the river have ceased to exist ; the river is itself a natural boundary, and every changing condition of the river in relation to adjoining lands is treated as a natural relation and is not affected in any manner by the relations of the river and the land at any former period. If, after washing away the intervening lot, it should encroach upon the remoter lot, and should then begin to change its movement in the

other direction, gradually restoring what it had taken from the remoter lot, and finally all that it had taken from the intervening lot, the whole, by the law of accretion, would belong to the remoter but now proximate lot. Having become riparian it has all riparian rights. This general principle is recognized by all the text-writers and by numerous decisions of the English and American courts. The river boundary is treated in all cases as a natural boundary and the rights of the parties as changing with the change of its bed."

This doctrine was approved in the case of *Naylor v. Cox*, 114 Mo. 232, 21 S. W. 589 ; *Wallace v. Driver*, 61 Ark. 429, 33 S. W. 641, 31 L. R. A. 317 ; *Cox ·v. Arnold*, 129 Mo. 337, 31 S. W. 592. In the last-cited case the third paragraph of the syllabus reads :

"A part of a fractional quarter-section belonging to plaintiff and bordering on the Missouri river was washed away by the current and a 'towhead' formed in the river between plaintiff's land and an island opposite thereto, and land gradually accrued to the "towhead" and extended toward plaintiff's quarter-section and within the limits of the original government survey thereof. *Held*, that as the land sued for was not an accretion to plaintiff's land, he had no title to it, notwithstanding it was within the boundaries of the original government survey of said quarter-section."

In *Ocean City Ass'n v. Shriver*, 46 Atl. (N. J.) 690, the doctrine laid down in *Welles v. Bailey*, supra, is held, by a divided court, to be unsound. The Minnesota decision (*Gilbert v. Eldridge*, 47 Minn. 210, 49 N. W. 679, 13 L. R. A. 411) commented on to sustain the law of the case was, however, controlled by the conditions under which the respective parties took title to the land.

The right to alluvion is founded on the principle of compensation ; that the owner of land subject to ero-

sion is entitled to indemnity for the loss of that taken away by gaining the benefit of soil added to his boundary by the process of accretion.    Blackstone says (2 Com. 262):

"And as to lands gained from the sea, either by alluvion, by the washing up of sand and earth, so as in time to make *terra firma;* or by dereliction, as when the sea shrinks back below the usual water-mark: in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the *land adjoining*.    For *de minimis non curat lex;* and, besides, these owners, being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is therefore a reciprocal consideration for such possible charge or loss."

In the present case Peuker, whose land at the time of the survey was remote from the river, suffered loss by erosion equally with Canter, the owner of the adjoining lots.    The application of the rule stated would not deny to such originally remote proprietor the ownership of such accreted land in front of his shore line, although it may be found within the original boundaries of lots 1 and 2.

When the waters washed the land of plaintiff in error, after eating away portions of lots 1 and 2, Canter, the owner of said lots, had the right of navigation and fishery, in common with the public, in the stream which displaced the land within his original boundaries, but he had no ownership in the bed of the river. (*Railway v. Ramsey*, 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559.)    He could not prevent others from enjoying the same rights therein which the law accorded to him.    It is held in England that if the sea, by gradual and imperceptible progress, encroach upon the land of a subject, the land thereby covered with

Peuker v. Canter.

water belongs to the crown. (*In re Hull and Selby Rail-way*, 5 M. & W. 327.)   By the American revolution the people of each state acquired the absolute right to all their navigable waters and the soil under them. (*Martin et al. v. Waddell*, 16 Pet. 367, 10 L. Ed. 997.) In *Wood v. Fowler*, supra, Mr. Justice Brewer, in speaking of the Kansas river, which was held to be a navigable stream, at page 690, said :

"The title to the soil being in the state, and the stream being a public highway, obviously the ownership of the ice would rest in the general public, or in the state as the representative of that public.   The riparian proprietor would have no more title to the ice than he would to the fish."

When the river encroached on the Peuker land, carrying away parts of Canter's fractional tracts, the title of the latter to the submerged lands was gone. So was the title of Peuker to that part of his forty acres which the current had eaten away and which was submerged by the waters.   When the alluvion began to form it had a line of contact of about 700 feet on the land of plaintiff in error, and also attached itself to the irregular shore line of what was left of lots 1 and 2.   The plaintiff in error is not entitled to all the made land, but only to an equitable proportion of it.   There are not facts sufficient presented by the record for the establishing of a rule which will determine to just what proportion of the alluvion the parties are entitled.   This should be settled by the court below on equitable grounds.   (Gould, Wat., 3d ed., §§ 162–165 ; *Johnston v. Jones et al.*, 1 Black [U. S.] 209, 17 L. Ed. 117.)

The judgment of the court below will be reversed and a new trial granted.