[File No. 6940]

STATE OF NORTH DAKOTA, Respondent, v. H. C. LOY, Ben Janssen, Paul Leupp, the Village of Stanton, a Municipal Corporation, and H. C. Leupp, Appellants.

(20 NW2d 668)

Opinion filed November 21, 1945

*Wilcox & Wilcox* and *Hyland & Foster,* for appellants.

*Alvin C. Strutz,* Attorney General and *C. E. Brace* and *P. O. Sathre,* Assistant Attorneys General, for respondent.

BURKE, J. This is a statutory action to determine adverse claims to a tract of land lying in Sections 6, 7, 8, 17 and 18 of Township 144 North, Range 84 West of the 5th principal meridian, Mercer County, North Dakota, containing 1145.5 acres. The State of North Dakota is plaintiff. Its claim of title to the described land rested upon the allegation that the land was formed as an island in the bed of the Missouri River, a navigable stream. The defendants each claimed title to a portion of the land as an accretion to riparian lands owned by them respectively. The defendants also urged that the riverside boundary of their riparian lands was the thread of the stream and that they each thus acquired title to any island or islands that formed in the river between the thread of the stream and their respective holdings. The trial court found against the defendants upon both contentions and rendered judgment quieting title to the said land in the State of North Dakota. The defendants have appealed from the judgment and have demanded a trial anew in this court.

It is conceded by all parties that the Missouri River is a navigable stream. There are thus but two questions in the lawsuit. 1. Was the land in question formed as an island in the bed of the Missouri River? 2. If it was so formed, to whom does it belong?

The original governmental plat of Township 144 North, Range 84 West, surveyed in 1881, shows that the Missouri River entered the township in its northwest corner, the right bank of the river intersecting the northern boundary at a point approximately one-half mile from the west boundary of the township. Thence the direction of the line of the right bank was slightly east of south to the south line of section 6, thence south across section 7. As the river entered section 18, it turned almost 90° to the east, its right bank curving in an irregular arc for approximately three quarters of a mile. As shown by the plat the right bank of the river is eastern boundary of lands owned by defendants in sections 6 and 7 and the northeastern and northern boundary of lands owned by defendants in section 18. As shown by this survey, the river varied in width as it flowed by

defendants' lands from half a mile to a mile, (distances are approximate) the narrowest point being at the bend of the river in section 18. This plat shows no bars or other obstructions in the river. It does show a large sand bar extending into the stream from its left bank opposite defendants' property indicating that at that time the thread of the stream was closer to the right bank, the side upon which defendants' lands lay. This plat also shows that the Knife River, an unnavigable tributary of the Missouri, entered the Missouri at an acute angle from the northwest at a point in section 6 a little over a quarter of a mile south of the north line of the township.

According to the record the next survey of this area was made in the years 1889 to 1891. The results of the survey are shown by a map published by the Chief of Engineers, United States Army in 1891. This map shows marked changes in topography. The river had cut behind the bar upon its left bank and was then a mile to a mile and a quarter in width opposite defendants' lands in sections 6, 7 and 18. The right bank of the river was as shown by the original survey except in the southern portion of section 7 where a bar approximately three eighths of a mile long and one eighth of a mile wide projected from the bank. In the river was a large bar over two miles in length extending south from the north line of the township to a point opposite the bend of the river in section 18. A growth of brush is shown upon the west side of the bar. No vegetation is shown upon its eastern half nor upon its northern or southern extremities. This bar divided the stream, part of which flowed upon the west side thereof and part on the east. Apparently the main channel was upon the east for it is in this channel that the river soundings are shown. The mouth of the Knife River had moved southward approximately one-fourth mile so that it emptied into the Missouri at a point south of the northern end of the large bar in the river. Thus all of the waters of the Knife were confined to that part of the Missouri which flowed upon the west side of the bar. This map shows conclusively that the large bar was an island in the river at the time the survey upon which it is founded was made.

The testimony of the witnesses of both the plaintiff and the defendants is that it remained an island at least until 1909. Mr. Loy, the principal witness for the defendants, testified that Missouri River water ceased flowing west of this bar in low water "close to 1909, 10 or 11, in there somewhere." The testimony of other witnesses places the date much later and shows that the main channel of the river shifted constantly from one side of the island to the other, but that at all times until about 1916 there was Missouri River water in both channels.

The claim of the defendants is, as we understand it, that the nucleus of the large bar was formed as an accretion to the right bank of the river in sections 7 and 18, and after the bar had projected from the shore a considerable but indefinite distance into the river, the river cut through between the bank and the outer extremity of the bar by avulsion, that the rights they had acquired to the bar by accretion could not be destroyed by avulsion, that the bar and the subsequent accretions thereto remained their property despite the fact that for a long period thereafter it remained an island.

There was only one witness whose testimony tended to support this theory. It was the witness H. C. Loy. He stated a sand bar commenced building out from the shore on the right bank of the river in sections 7 and 18 along in '87 or '88 or possibly '89 and that the river "jumped across the bar quite awhile after it started to form."

On the other hand, Mrs. August Borner testified that when she came to the vicinity of Stanton in 1886 there was an island bar in the Missouri River east of the village. Stanton is located upon the bank of the river in the southern part of section 6, its southern boundary being the south line of section 6. She stated that the land in controversy here was formed by accretion to this island. There is no other testimony in the case concerning the process by which the bar or island had its origin. The testimony of all other witnesses related to the vagaries of the stream from the year 1895 until the present day. Defendants lay considerable stress upon the fact that the trees upon the west side of the island are larger than those upon any other

part, and are approximately the same size as the trees on the accretion land on the river bank. They say this fact supports Mr. Loy's statement as to the manner of origin of the island. It does so only in the sense that it is consistent with Mr. Loy's contentions. It is not, however, inconsistent with the claim that the land in controversy was formed as an island and by the accretions thereto. The size and location of the trees is consistent with topography shown by the survey made by the Chief of Engineers, U. S. Army in 1891. This survey shows both the island and an accretion to the west bank of the river. It shows that the vegetation is heaviest near western side of the island, but that this vegetation does not extend to the island's western shore. It also shows little or no vegetation upon the accretion to the west bank of the river. If, as is probable, the land bearing the heaviest growth was formed first, the bar in the river was formed before the accretion to the bank or in other words it was formed as an island. Other topographical features shown by this survey, such as the size and the shape of the island, the direction of the flow of the Knife River, the location of the mouth of the Knife River and the angle at which it enters the Missouri, all attest to the probability of the truth of the testimony of plaintiff's witness. We therefore affirm the trial court's finding that the land in question was formed as an island and by the accretion thereto.

Is this fact sufficient to vest title to the land in the State? Section 47–0608, Rev Code 1943, provides: "Islands and accumulations of land formed in the beds of streams which are navigable belong to the state, if there is no title or prescription to the contrary."

This statute has remained unchanged since territorial days. It appeared first as § 586 of the Civil Code of 1877. It became the law of the State when North Dakota was admitted to the Union. The defendants assert that this statute does not operate to give title to the island to the State for two reasons, first, because they had a title to the contrary at the time North Dakota became a state, and second, because the statute is repugnant to § 4 of the Enabling Act.

Defendants claim title by reason of their acquisition of title to the riparian lands prior to statehood. They say that under their grants the riverside boundary of their lands was the thread of the stream. Their grants are not in evidence. We assume therefore that the granted land was described as the fractional lots shown by the official survey of 1881. It is well settled that the boundary of a fractional lot which has been granted by the United States and which borders upon a navigable river, is the bank of the river and not the thread of the stream. In St. Paul & P. R. Co. v. Schurmeir, 7 Wall.(US) 272, 288, 19 L ed 74, 77, the Supreme Court said:

". . . the court does not hesitate to decide, that Congress, in making a distinction between streams navigable and those not navigable intended to provide that the common-law rules of riparian ownership should apply to lands bordering on the latter but that the title to lands bordering on navigable streams should stop at the stream."

The above case is cited with approval in Scott v. Lattig, 227 US 229, 57 L ed 490, 33 S Ct 242, 44 LRA(NS) 107, decided in 1913. Decision in these cases was based upon the court's conclusion that Congress had by statute, modified the common-law rule with respect to the boundaries of lands bordering upon navigable rivers above tidewater. The same result has been reached upon different grounds in other cases.

In United States v. Holt State Bank, 270 US 49, 70 L ed 465, 46 S Ct 197, the Supreme Court said:

". . . as was pointed out in Shively v. Bowlby, 152 US 49, 57, 58, 38 L ed 349, 352, 14 S Ct 548, the United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future states, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to particular disposals by some international duty or public exigency. It follows from this that disposals by the United States during the territorial period are not lightly to be inferred, and should not

be regarded as intended unless the intention was definitely declared or otherwise made very plain."

The State of North Dakota recognizes that the boundaries of lands bordering on navigable streams extend to the low water mark. Gardner v. Green, 67 ND 268, 271 NW 775. It is thus clear that defendant's grants from the United States to riparian land along the Missouri River did not include any part of the bed of the stream.

Defendants have raised another objection to the State's title to land under navigable waters. They say, conceding the general rule to be as above stated, nevertheless, the State did not acquire title to these lands for the reason that the Enabling Act under which North Dakota became a state, contains a disclaimer of all title to such lands, and if defendants do not own them, they remain the property of the United States. They rely on that part of § 4 of the Enabling Act which provides as follows:

"That the people inhabiting said proposed states (North Dakota, South Dakota, Montana and Washington) do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof."

The contention is that by reason of this disclaimer, the State, when admitted, acquired title only to the lands which were specifically granted to it by other provisions of the enabling act; that such grants do not include the beds of navigable streams and therefore the title to the beds of such streams remained in the Federal Government. This contention cannot be sustained. The beds of navigable streams are not unappropriated public lands. Pollard v. Hagen, 3 How(US) 212, 11 L ed 565. During territorial days title to these lands was held in trust by the United States for the "Ultimate benefit of future states. United States v. Holt State Bank, 270 US 49, 70 L ed 465, 46 S Ct 197, supra. When sovereignty was conferred upon the State of North Dakota it gained title to the lands under navigable waters as an incident of sovereignty. No specific conveyance of such title was necessary. In Scott v. Lattig, 227 US 229, 57 L ed 490, 33 S Ct 242, 44 LRA(NS) 107, supra, it was said:

". . . it was settled long ago by this court, upon a consideration of the relative rights and powers of the Federal and state governments under the Constitution, that lands underlying navigable waters within the several states belong to the respective states in virtue of their sovereignty, and may be used and disposed of as they may direct, subject always to the rights of the public in such waters and to the paramount power of Congress to control their navigation so far as may be necessary for the regulation of commerce among the states and with foreign nations, and that each new state, upon its admission to the Union, becomes endowed with the same rights and powers in this regard as the older ones." See also United States v. Holt State Bank (US) supra; United States v. Oregon, 295 US 1, 79 L ed 1267, 56 S Ct 610; United States v. Utah, 283 US 64, 75 L ed 844, 51 S Ct 438.

Although there is evidence in the record that the island here in controversy had commenced to form as early as 1886, it is not claimed by the defendants that it had become fast dry land at the time North Dakota was admitted in November 1889. In fact the only evidence in the record of the condition of the island in 1889, is the defendant Loy's testimony that it commenced to form in 1887 or 1888 or 1889. We therefore think it reasonable to conclude that the island or sand bar had not at that time attained a degree of stability which would except it from the transfer of the river bed to the state. Grand Rapids & I. R. Co. v. Butler, 159 US 87, 40 L ed 85, 15 S Ct 991; United States v. Chandler-Dunbar Water Power Co. 209 US 447, 52 L ed 881, 28 S Ct 579.

Since at the time North Dakota became a state it acquired title to the lands under all navigable waters within its borders and complete dominion over such lands subject only to the limitations of the Commerce Clause of the Federal Constitution, its statutory reservation of title to the beds of such waters and the accretions thereto is controlling. Roberts v. Taylor, 47 ND 146, 181 NW 622.

The judgment of the District Court quieting title in the State

of North Dakota to the lands described in the complaint is accordingly affirmed.

CHRISTIANSON, Ch. J., and NUESSLE and BURR, JJ., and COYNE, Dist. J., concur.

Mr. Justice MORRIS, deeming himself disqualified, did not participate, Hon. EUGENE F. COYNE, Judge of Third Judicial District, sitting in his stead.