Isabel M. PERRY, Plaintiff and Respondent,

v.

James P. ERLING, Margaret H. Erling, and Margaret H. Erling, James Phillip Erling and Philip B. Vogel, as Executors of the Estate of Herman C. Erling, Deceased, and Jack Fox, Gladys Fox, Rose Marie Erling, Defendants and Appellants,

Park District of the City of Bismarck, a public corporation, Defendant and Appellant,

Warren Whitson et al., Defendants.

No. 8161.

Supreme Court of North Dakota.

Jan. 22, 1965.

Rehearing Denied Feb. 23, 1965.

Zuger, Zuger & Bucklin, Bismarck, for defendant and appellant Park District of City of Bismarck.

William R. Mills, Bismarck, for defendants and appellants James P. Erling, Margaret H. Erling, and Margaret H. Erling, James Phillip Erling, and Philip B. Vogel, as Executors of Estate of Herman C. Erling, Deceased, and Jack Fox, Gladys Fox, and Rose Marie Erling.

Milton K. Higgins, Bismarck, for plaintiff and respondent.

ERICKSTAD, Judge.

In this case we have two separate appeals from a judgment entered in December, 1963, by the District Court of Burleigh County, quieting title to certain land in the plaintiff, Isabel M. Perry. A trial de novo is demanded.

The defendant Park District of the City of Bismarck, a public corporation, appeals, contending that the Perry action should have been dismissed for the reason that the contested land is owned by the United States Government. Defendants Erling et al. appeal, contending that title to the land should be quieted in the executors of the last will of Herman C. Erling, deceased, on the strength of their counterclaim.

The plaintiff, Mrs. Perry, claims that she is the owner of all land formed as alluvion to the Northeast Quarter of Section 8, Township 138 North of Range 80, situated in Burleigh County, North Dakota, consisting of that land extending west from the western boundary of said Northeast Quarter to the east bank of the Missouri River at low water mark. She claims that said tract of land is alluvion, built by the process of accretion to the Northeast Quarter of said Section 8, and that this land belongs to her as the grantee of a deed from the owner of the Northeast Quarter. She acknowledges that the fractional Northwest Quarter of Section 8, more correctly described as the East Half of the Northwest Quarter and Lots 1 and 2, all in Section 8, and the fractional Northeast Quarter of Section 7, more correctly described as Lot 1 of Section 7, were in existence as public domain when the land was originally surveyed in 1872; that Lots 1 and 2 of Section 8 and Lot 1 of Section 7 were riparian; that these lots and the East Half of the Northwest Quarter of Section 8 were intervening tracts between the Northeast Quarter of Section 8 on the east and the Missouri River on the west; and that therefore the Northeast Quarter of Section 8 was not riparian land at the time of the original survey.

She contends that sometime between 1872 and the present time the Missouri River moved eastward, so that all of the intervening land and some of the Northeast Quarter was lost by erosion, whereby the

remaining portion of the Northeast Quarter of Section 8 became riparian, and that thereafter land was rebuilt by imperceptible degrees to the said Northeast Quarter, extending over the locations of the former intervening tracts and some distance beyond those tracts as the river receded to the west.

The following is a reproduction of the pertinent portion of a plat of the original government survey of 1872.

The defendant Park District contends that the plaintiff failed to prove that all of the intervening land was lost by erosion and that thereafter the land in contest was rebuilt by imperceptible degrees as accretion to the Northeast Quarter of Section 8,

but maintains that, even if this were proved, the plaintiff, a nonriparian owner at the time of the original survey, could claim title only to the accretions within the boundary lines of the Northeast Quarter of Section 8; and that all other accretions extending across the western boundary of said Northeast Quarter to the Missouri River on the west became the property of the owner of the former intervening riparian land.

Our statute on accretions reads as follows:

"47–06–05.  Riparian accretions.— Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."  North Dakota Century Code.

Heretofore this court has not been asked to apply this statute to factual situations similar to this case.  The decisions of other courts which have considered comparable facts are in conflict.  The rule contended for by the plaintiff is stated by an early Iowa decision which cites a number of cases in support thereof.

"It also appears to be the law that, where the lands of a riparian owner have been slowly and gradually eroded by a navigable stream, and the river has usurped and taken up the location of said land, the riparian owner of the land at the newly formed river bank becomes entitled to the accretions that may thereafter be formed against said bank, even though they should extend over the same territory where lands of a former riparian owner had been located before the erosion took place. * * * Yearsley v. Gipple, 104 Neb. 88, 175 N.W. 641, 8 A.L.R. 636; Welles v. Bailey, 55 Conn. 292, 10 Atl. 565, 3 Am.St.Rep. 48; Widdecomb[e] v. Chiles, 173 Mo. 195, 73 S.W. 444, 61

L.R.A. 309, 96 Am.St.Rep. 507; Wood v. McAlpine, 85 Kan. 657, 118 Pac. 1060; Fowler v. Wood, 73 Kan. 511, 85 Pac. 763, 6 L.R.A. (N.S.) 162, 117 Am.St.Rep. 534; Naylor v. Cox, 114 Mo. 232, 21 S.W. 589; Peuker v. Canter, 62 Kan. 363, 63 Pac. 617." Payne v. Hall, 192 Iowa 780, 185 N.W. 912, at 915.

In an Iowa decision rendered in 1959, that court said:

"* * * Right or wrong, it is well established that lands of a riparian owner are as subject to being lost by the gradual process of erosion by the river as they are of being added to by the process of accretion.  We said in Payne v. Hall, 192 Iowa 780, 783, 185 N.W. 912, 914: 'Where the lands of a riparian owner are removed by the gradual process of erosion by the river, the land being no longer capable of identification, but having been carried away entirely, and the river occupies the identical space formerly occupied by the lands of the riparian owner, the title to the land so occupied by the bed of the river passes from the owner of the land to the state.' " Wilcox v. Pinney, 250 Iowa 1378, 98 N.W.2d 720, at 723.

The Nebraska Supreme Court expressed its version of the rule in Wemmer v. Young:

"If by gradual erosion a river becomes the boundary of land, the owner thereof is a riparian owner and is entitled to all accretion thereof.  If by the process of accretion and reliction the water of a stream gradually recedes, changes the channel of the stream, and leaves the land dry that was previously submerged by water, the land becomes the property of the riparian owner.  The erosion of a river which cuts entirely across riparian land and into the land of an adjoining owner operates to destroy the title of him whose land was originally riparian and he may not

reassert his title if the river reverses its traverse wanderings and new land is formed within what were his original boundaries. Worm v. Crowell, * * * [165 Neb. 713, 87 N.W.2d 384]." Wemmer v. Young, 167 Neb. 495, 93 N.W.2d 837, at 848.

In the leading decision propounding the defendant Park District's view, the Supreme Court of South Dakota said:

"In Peuker v. Canter, 62 Kan. 363, 63 Pac. 617, the Missouri river washed away all of the tract that was riparian to the river and for some distance into the more remote tract. The river then receded and, by accretion, restored all of both tracts precisely as was done in this case. The Supreme Court of Kansas followed the rule announced in Welles v. Bailey, [55 Conn. 292, 10 A. 565, 3 Am.St.Rep. 48] * * *. This rule appears, as is indicated by some of the above-quoted language, to have sprung from the fact that, when the riparian estate is destroyed and carried away, the boundary line between that and the adjacent estate is obliterated and lost, and that, in case of restoration by accretion or reliction, there is no way of identifying the original estate, and therefore it is deemed to have been entirely destroyed and lost. But no such reason exists in this case. The boundary line between the lands of appellant and respondent was a government section line, and of course can be re-established without difficulty. In the absence of the reason, there is no justification for the rule. Without holding that, in all cases where land has been carried away or submerged by the action of the water in a lake or river and afterward restored by the action of such water, such land belongs to the original owner thereof, we can see no reason, in justice or equity, why the land involved in this case, after it had been restored by the river, should be given to respondent merely because the river had at some time touched her land. After her land had been fully restored to her, she had all that she was entitled to or in good conscience could demand. What seems to us to be the rational rule applicable to the facts as they appear in this case is that announced in [Ocean City] Association v. Shriver, 64 N.J.Law, 550, 46 Atl. 690, 51 L.R.A. 425. This case is supported by a formidable array of authorities which are collected and reviewed in the opinion of the court and cited in the note appended thereto in 51 L.R.A. These cases fully sustain appellant's contention. We believe that, after appellant's land had been restored by the action of the river, being capable of identification, it belonged to appellant and should be treated as though it had never been submerged at all." Allard v. Curran, 41 S.D. 73, 168 N.W. 761, at 761-762.

It should be noted that the Nebraska court in 1919, the year following the Allard case, said that in Ocean City Assn., the case which Allard cites with approval, there is a misconception as to the rule laid down in Lord Hale's De Juris Maris. The court holds that the rule stated in Ocean City Assn. is from that portion of De Juris Maris dealing with the sudden retreat of the sea and is not applicable to "cases of pure accretion." Yearsley v. Gipple, 104 Neb. 88, 175 N.W. 641, 8 A.L.R. 636.

The Allard decision was followed in South Dakota in 1925 in Erickson v. Horlyk, 48 S.D. 544, 205 N.W. 613. The appellant in that case contended that the decision in Allard led to a judicial repeal of Section 498 of the Revised Code of 1919. Said section of the law read as follows:

"Sec. 498. Riparian Accretions. Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing

right of way over the bank." South Dakota Revised Code of 1919.

The court said:

"We think the proper interpretation of said section 498 is that it applies to land which is riparian according to the government survey. We therefore think there is room for both the code section and the decision in Allard v. Curran, supra, to stand, and that neither is in conflict with the other." Erickson v. Horlyk, supra, 205 N.W. at 614.

It should be noted that our statute on riparian accretions is identical to Section 498 of the South Dakota Revised Code of 1919.

The United States District Court for the Eastern District of Oklahoma in 1955 found the Oklahoma rule in accord with the rule announced in Curran.

"Although there is a sharp conflict in the authorities dealing with the legal effect of the submersion of riparian land and the consequent destruction of boundary lines, the Oklahoma rule, and better reasoned rule, does not permit a subsequent accretion to land originally nonriparian where the boundary lines of the submerged land can accurately be re-established upon a withdrawal and receding of the river or stream.

"The rationale of the rule permitting accretion to land originally nonriparian, but made riparian by virtue of the total submerging of the land originally riparian, found its genesis in the fact that such submersion hopelessly destroyed all former boundary lines and it was impractical to ever again attempt to identify the boundaries of the submerged land.

"However, where as in the instant case the unallotted land was accurately surveyed and the original lines can readily and accurately be re-established there is no reason either in law or equity why the owner of the submerged land is not entitled to reassert dominion over the land once the river or stream withdraws." Choctaw and Chickasaw Nations v. Herron, 130 F.Supp. 720, at 722 (E.D.Okla.1955).

Our court, in a decision rendered in 1937, in dividing accretions between owners who were riparian at the time of the original survey, had this to say:

"The fundamental theory underlying the ownership of accretions is that each of the several riparian owners shall have a frontage on the new shore proportionate to his frontage on the old one, connecting their respective points by straight lines. A common principle which pervades all modes of division is that no regard is paid to the direction of the side lines between contiguous owners, but the reference is solely to the shore line. 1 R.C.L. p. 244.

"The main objects to be kept in view in any division of accretions is that the division shall be equitable and that it shall be proportional so as to give each shore owner a fair share of the land to be divided and his due portion of the new shore line proportionate to his share on the original line of the water. 3 Farnham, Waters and Water Rights, p. 2475.

"It is not necessary or proper to determine here whether, if a case should arise where the application of the general rule for the apportionment of accretions would result in such inequality as to make it inequitable, such rule should be modified; for that situation is not presented here." Gardner v. Green, 67 N.D. 268, 271 N.W. 775, at 783.

In Gardner, the original line of the water was the shore line of the river at the time of the original survey, and both the plaintiff and the defendant were riparian owners at that time.

In Oberly v. Carpenter, this court said:

"The defendants further insist that, in any event, the new land thus added to the plaintiff's land and to which plaintiff claims title under section 5473, cannot extend beyond the section line between section 24 and 25 and section 23 and 26. The first answer to this contention is that at the time of the survey this section line was not run north of the river. The second and conclusive answer is that the law governing riparian rights has no regard for artificial boundary lines, whether between sections or their subdivisions, or between counties, states, or nations. See the illuminating opinion of Mr. Justice Brewer in Nebraska v. Iowa, * * * [143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186]. See, also, Widdecombe v. Chiles, 173 Mo. 195, 73 S. W. 444, 61 L.R.A. 309, 96 Am.St.Rep. 507; Yearsley v. Gipple, 104 Neb. 88, 175 N.W. 641, 8 A.L.R. 636; Doebbeling v. Hall et al., 310 Mo. 204, 274 S.W. 1049, 41 A.L.R. 382. The controlling rule as it applies in the instant case may be stated thus: 'Where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary, and a deed describing the lot by number or name conveys the land up to such shifting line exactly as it does up to a fixed side line and conveys all accretion thereto.' Jefferis v. East Omaha Land Company, * * * [134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872]." Oberly v. Carpenter, 67 N.D. 495, 274 N.W. 509, at 513.

Oberly involved a contest between a riparian owner on the north side of the Missouri River and a riparian owner on the south side. The court, in effect, held that accretions to the north bank of the Missouri River became the property of the riparian owner of the north side of the river, even though the accretions extended, as the river's course moved to the south, over an area formerly occupied by land of the riparian owner of the south bank of the Missouri River.

In 1955, this court, in determining title to accretions between the owner of an island and a mainland riparian owner, had this to say:

"Where an island arises in a navigable river apart from riparian owners' land, as in the case at bar, such owners cannot claim title thereto by reason of their riparian rights, though the island is afterwards joined to their land, since it did not become part thereof by gradual accretion to or reliction from the shore. Holman v. Hodges, * * * [112 Iowa 714, 84 N.W. 950, 58 L.R.A. 673, 84 Am.St.Rep. 367]; Hahn v. Dawson, 134 Mo. 581, 36 S.W. 233; Crandall v. Smith, 134 Mo. 633, 36 S.W. 612; Buse v. Russell, 86 Mo. 209, 214. It is upon this principle that many of the cases cited by counsel for defendants do not sustain their position in the case at bar. Typical of these cases are Allard v. Curran, 41 S.D. 73, 168 N.W. 761; Yearsley v. Gipple, 104 Neb. 88, 175 N.W. 641, 8 A.L.R. 636; Dailey v. Ryan, 71 S.D. 58, 21 N.W.2d 61. See also 8 A.L.R. 640, 41 A.L.R. 395. These are cases where the Missouri River washed away all of a tract that was riparian to the river and for some distance into a more remote tract and thereafter the river receded and by gradual accretion to or reliction from the mainland restored all of both tracts. This situation must be distinguished from the case at bar where the accretions and relictions claimed by the plaintiffs accrued to the island and not to the mainland." Hogue v. Bourgois, N.D., 71 N.W.2d 47, at 54.

In Hogue, land accreted in two opposite directions, to an island in the Missouri River and to the mainland on the east. Under those circumstances the court held that the owner of each owned accretions to the line of contact of the accretions. As a result, the island owner became the owner

of the land which accreted to the island, although it included land built over a location formerly occupied by the land of the mainland riparian owner.

In holding that the owner of an island in a navigable river is entitled to lands added thereto by accretion, the Supreme Court of South Dakota said that the island owner's rights were commensurate with those of other riparian owners. Waldner v. Blachnik, 65 S.D. 449, 274 N.W. 837, at 839.

This review of our previous decisions discloses that we have applied Sec. 47–06–05, N.D.C.C., on riparian accretions, to disputes between owners of land riparian according to the original Government survey and to a dispute between the owners of land riparian according to the original Government survey and the owner of an island in a navigable stream to which land had accreted. The pertinent question presented here is whether the statute applies in the instant case to divest the original riparian owner of title and prevent the vesting in him of title to the land rebuilt where his former land was located.

It is contended that the language of the statute is clear and unambiguous; that the statute clearly applies in this instance; and that it has only one meaning and that is, that accretions to the bank of a stream belong to the owner of the bank.

We, however, believe that the language of the statute is not clear, and that, in attempting to apply the statute to the facts of this case, a question immediately arises. Does the accreted land belong to the bank or riparian owner according to the original survey or to the owner of the bank at that moment in time when the process of erosion terminates and the process of accretion begins.

Because this is not clear, it is our duty to attempt to determine the intent of the Legislature in enacting this statute. In so doing, we must construe the statute.

"In construing a statute, the spirit of the enactment must be considered and the statute should, if possible, be construed in accordance therewith. In pursuance of the general object of giving effect to the intention of the legislature, the courts are not controlled by the literal meaning of the language of the statute, but the spirit or intention of the law prevails over the letter thereof, it being generally recognized that whatever is within the spirit of the statute is within the statute although it is not within the letter thereof, while that which is within the letter, although not within the spirit, is not within the statute. Effect will be given the real intention even though contrary to the letter of the law.

"The rule of construction according to the spirit of the law is especially applicable where adherence to the letter would result in absurdity or injustice, * * *." 82 C.J.S. Statutes § 325 (1953).

See also: Holmes v. Hughes, 125 Cal. App. 290, 14 P.2d 149; Wallen v. Collins, 6 W.W.Harr. 266, 36 Del. 266, 173 A. 801; Weybright v. Klein, 104 Colo. 590, 92 P.2d 734; Leo v. Board of Medical Examiners, 36 Cal.App.2d 490, 97 P.2d 1046; Appeal of Chung, 44 Hawaii 220, 352 P.2d 846; People v. Hale, 156 Cal.App.2d 478, 319 P.2d 660; Montoya v. McManus, 68 N.M. 381, 362 P.2d 771; State v. Williams, 94 Ohio App. 249, 115 N.E.2d 36; Sculley v. City of Philadelphia, 381 Pa. 1, 112 A.2d 321; Metropolitan Utilities District v. City of Omaha, 171 Neb. 609, 107 N.W.2d 397.

Recognizing that this court in previous decisions involving apportionment and division of accretions has considered the equities of the situation, and believing that the Legislature would not have intended the unjust result of divesting title in the riparian owner forever and giving a non-riparian owner title to the land rebuilt where the former land of the original riparian owner was located, it is our opinion that the Legislature did not intend this statute to extend to this case.

■ We therefore conclude that where land which was riparian at the time of the original survey is lost by erosion, so that nonriparian land becomes riparian, and land is thereafter built by accretion to the land which was originally nonriparian, extending over the location formerly occupied by the original riparian land, the owner of the land which was originally nonriparian has title only to the accreted land within the boundaries of the formerly nonriparian tract; and that all other land so accreted, extending over the area formerly occupied by the land of the original riparian owner, becomes the property of the owner of the original riparian land. As the controlling boundary line in the instant case is the quarter line between the Northeast Quarter and the Northwest Quarter fraction of Section 8, there could be no difficulty in determining the extent of the accretions to the respective tracts. For these reasons the plaintiff's action fails and the complaint must be dismissed.

We now turn our attention to the claim of the defendants Erling et al. that title should be quieted in the executors of the last will of Herman C. Erling, deceased, on their counterclaim. They claim that Herman C. Erling acquired title to the Northwest Quarter fraction through a deed from Katherine B. Farris, who acquired title to the property through a tax deed proceeding.

The defendant Park District, on the other hand, contends, among other things, that this court has no jurisdiction in a matter of which the land office under the Secretary of the Interior has jurisdiction.

In the instant case no patent has been issued to the Northwest Quarter fraction of Section 8. On August 7, 1961, the defendant Park District applied to the United States of America, under the Recreation and Public Purposes Act of June 14, 1926, for a patent. By decision dated December 21, 1961, the Bureau of Land Management of the Department of the Interior approved the application and ordered that a patent

be issued to the applicant, providing notice of the application be published and any objections of other parties filed after notice thereof be determined in favor of the applicant, and providing the purchase money be paid. The defendant Park District deposited $660 as the full purchase price and had the proper notice published. Plaintiff Perry and defendants Erling et al. filed objections. After hearing the objections the Bureau of Land Management, by written decision dated June 8, 1962, denied the claims of Perry and Erling et al. to the land and their objections to the issuance of a patent to the Park District. Perry did not appeal the decision, but Erling et al. did appeal within the time provided by Federal law. The Department of the Interior, through the Branch of Land Appeals, Division of Appeals, by written decision dated January 24, 1963, affirmed the previous decision. Erling et al. have appealed further to the Secretary of the Interior, as provided by Federal law. The decision on this last appeal has not been rendered.

■ Under these circumstances we agree that this court does not have jurisdiction to adjudicate title as between the defendants in this case.

"Congress has provided that there shall be in the Department of the Interior a Commissioner of the General Land Office who shall perform, under the direction of the Secretary of the Interior, all executive duties appertaining to the surveying and sale of public lands in the United States, or in any wise respecting such public lands, and also, such as relate to private claims of land, and the issuing of patents for all grants under the authority of the government. This authority of the government, consisting of the General Land Office with the Secretary of the Interior at its head, is commonly referred to as the Land Department. This department is a special tribunal and is vested by statute with substan-

tially exclusive jurisdiction to determine, in the first instance, all questions of fact respecting the disposition, acquisition, and control of the public lands, so long as the legal title thereto remains in the United States; and while such matters are pending in the Department, the courts are without jurisdiction thereof, in the absence of statute specifically conferring it. * * " 42 Am.Jur. Public Lands Sec. 57 (1942).

The Supreme Court of Iowa quoted the above with approval in State v. Nichols, 241 Iowa 952, 44 N.W.2d 49, at 55.

The United States Supreme Court, on petition for mandamus to require the Secretary of the Interior and the Commissioner of the General Land Office to approve and pass to patent certain coal claims, said:

"In [United States ex rel.] Riverside Oil Co. v. Hitchcock, 190 U.S. 316, 23 Sup.Ct. 698, 47 L.Ed. 1074, it was said that Congress has constituted the Land Department the administrator of the public lands and for the discharge of this duty invested it with judicial functions which are not subject to review by injunction or mandamus. This was repeated and applied in [United States ex rel.] Ness v. Fisher, 223 U.S. 683, 32 Sup.Ct. 356, 56 L.Ed. 610." United States ex rel. Alaska Smokeless C. Co. v. Lane, 250 U.S. 549, 40 S.Ct. 33, at 35, 63 L.Ed. 1135, at 1138.

Our court, in a case decided in 1906, said:

" * * * From the foregoing recital of the undisputed facts, it will be seen that the decision of the trial court is necessarily predicated upon the assumption that Mrs. McCurdy's entry is valid and Mrs. Zimmerman's claim is invalid. That is the precise question in litigation before the land department in the pending contest. Mrs. Zimmerman is in actual possession under a claim of right. If her claim is well founded, she has the right to retain possession and hold the land as a homestead, notwithstanding Mrs. McCurdy's entry. Manifestly her possession cannot be disturbed unless her alleged right is held to be unfounded. That question is one which, under the circumstances of this case, the courts have no jurisdiction to decide. That is a question which is within the exclusive jurisdiction of the Land Department to decide so long as the disposition of the land is under the control of the federal Land Department. Grandin v. Le Bar, [La Bar] 3 N.D. 446, 57 S.[N.]W. 241; Martinson v. Marzolf * * * [14 N.D. 301,] 103 N.W. 937; Cosmos Exploration Co. v. [Gray Eagle] Oil Co., 190 U.S. 301, 23 Sup.Ct. 692, 24 Sup.Ct. 860, 47 L.Ed. 1064." Zimmerman v. McCurdy, 15 N.D. 79, 106 N.W. 125, at 126.

Defendants Erling et al. contend that, although a patent to this land is not recorded, it nevertheless was issued, as indicated by the warranty deed issued by Erastus A. Williams, as Surveyor General, in 1882. It is significant to note here that the deed referred to was executed by Williams, not as Surveyor General, but in his individual capacity, in conjunction with his wife. The abstract of title shows no connection between Williams and his duties as the Surveyor General, nor does it indicate that he had a legal interest in the property in his individual capacity.

The abstract indicates that a final receipt was given in connection with the contested property to Carey H. Ireland on August 18, 1873. The receipt recites that: "the same is subject to any pre-emption claim which may be filed for said land within forty days from this date." According to the abstract, Ireland conveyed his interest in the property by warranty deed on August 30, 1873, to Walter C. Bacon, who, with his wife, Georgia A. Bacon, quit-claimed the said property to the Lake Superior and Puget Sound Company on November 17, 1873. The next entry in the abstract is that of the warranty deed dated June 29, 1882, executed by

Erastus A. Williams, signed "Erastus A. Williams" and "Mrs. E. A. Williams," which purported to convey the property to Edward Holland. Katherine B. Farris, who acquired a tax deed to this property on May 27, 1919, conveyed her interest therein to Herman C. Erling on June 23, 1959. The defendants Erling et al. claim title through Herman C. Erling, deceased, as executors of his will, as heirs, and as a tenant.

██ The defendants Erling et al. thus rest their claim of title upon a tax deed which was issued to the holder of tax sale certificates, subsequent to the levy of taxes upon the equitable interest of an assignee of a receiver's receipt. This equitable interest was defeasible in nature, and it, and any tax deed issued pursuant to its sale, would become void upon the cancellation of the receiver's receipt or the issuance of a patent to another entryman. 2 Patton on Titles Sec. 293 (2d ed. 1957). The questions of whether the receiver's receipt should be cancelled or whether a patent should be issued are wholly within the jurisdiction of the Department of the Interior of the United States and are now at issue in a proceeding before the Secretary of the Interior. This court is therefore without jurisdiction to make an adjudication that defendants Erling et al. have title. However, since the record shows that the defendants Erling et al. are in possession of the land under color of title, they are entitled to have that possession protected until the issue of title is decided by the Department of the Interior of the United States. They are therefore entitled to an injunction enjoining the plaintiff and the other defendants from interfering with that possession until such time as the issue of title is decided. Zimmerman v. McCurdy, 15 N.D. 79, 106 N.W. 125.

The case is therefore remanded with instructions to the trial court to enter judgment consistent with this opinion.

KNUDSON, J., did not participate.

TEIGEN, Judge (concurring specially).

I concur in the opinion and in the result. I feel a little further explanation of the reasons therefor is apropos.

The beds of navigable streams were held in trust by the United States for the "ultimate benefit of future States." Pollard v. Hagan, 3 How. (U.S.) 212, 11 L.Ed. 565; United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465.

When sovereignty was conferred upon the State of North Dakota, it gained title to the lands under navigable waters as an incident of sovereignty. No specific conveyance of such title was necessary. State v. Loy, 74 N.D. 182, 20 N.W.2d 668.

In Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A., N.S., 107, it was said:

"* * * it was settled long ago by this court, upon a consideration of the relative rights and powers of the Federal and state governments under the Constitution, that lands underlying navigable waters within the several states belong to the respective states in virtue of their sovereignty, and may be used and disposed of as they may direct, subject always to the rights of the public in such waters and to the paramount power of Congress to control their navigation so far as may be necessary for the regulation of commerce among the states and with foreign nations, and that each new state, upon its admission to the Union, becomes endowed with the same rights and powers in this regard as the older ones."

See also United States v. Holt State Bank, supra; United States v. State of Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; United States v. State of Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844.

When North Dakota became a State, it adopted several territorial statutes which are still in force providing for methods of disposition of the beds of navigable streams. These statutes provide that where a navi-

gable stream forms a new course abandoning its ancient bed, the owners of the land newly occupied take by way of indemnity the ancient bed abandoned, each in proportion to the land of which he has been deprived (Section 47–06–07, N.D.C.C.); that islands and accumulations of land formed in the beds of streams which are navigable belong to the State, if there is no title or prescription to the contrary (Section 47–06–08, N.D.C.C.); that where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank (Section 47–06–05, N.D.C.C.); and that except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low watermark, provided, however, that all navigable rivers shall remain and be deemed public highways (Section 47–01–15, N.D.C.C.). In recognition of the Federal reservation, our statutes provide that the ownership of land below ordinary high watermark and of land below the water of a navigable lake or stream is regulated by the laws of the United States, or by such laws as under authority thereof the legislative assembly may enact (Section 47–01–14).

This court has held in several cases that the meander line is not a boundary line but that tracts of land abutting upon a stream run to the shore line. Heald v. Yumisko, 7 N.D. 422, 75 N.W. 806; Gardner v. Green, 67 N.D. 268, 271 N.W. 775; Oberly v. Carpenter, 67 N.D. 495, 274 N.W. 509.

The title of the State to lands below the low watermark of a navigable stream is coextensive with the bed of the stream as it existed when North Dakota was admitted to the Union as a State in 1889, and such changes therein as may since have occurred within the lots bordering thereon at the time of the original survey. This is so because the boundary of such lots was fixed as the shore line of the stream.

In other words, fractional lots bordering on a navigable stream extend to the low watermark where it is not otherwise designated and the stream constitutes a variable boundary dependent upon the vagaries of the stream.

The laws of the United States provided the following rules for ascertaining the boundaries of public lands that had been surveyed by the surveyor general. These rules existed at the time of the survey in this case.

"The boundaries and contents of the several sections, half-sections, and quarter-sections of the public lands. shall be ascertained in conformity with the following principles:

"First. All the corners marked in the surveys, returned by the surveyor-general, shall be established as the proper corners of sections, or subdivisions of sections, which they were intended to designate; and the corners of half and quarter sections, not marked on the surveys, shall be placed as nearly as possible equidistant from two corners which stand on the same line.

"Second. The boundary-lines, actually run and marked in the surveys returned by the surveyor-general, shall be established as the proper boundary-lines of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof. And the boundary-lines which have not been actually run and marked shall be ascertained, by running straight lines from the established corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary-lines shall be ascertained by running from the established corners due

north and south or east and west lines, as the case may be, to the water-course, Indian boundary-line, or other external boundary of such fractional township." 2 Stat. at L. 313, Chap. 14, Rev.Stat. § 2396. 43 U.S.C.A. § 752.

It is a well-settled rule of statutory construction that a statute must be construed with reference to other statutes concerning the same subject matter or a part of the same general system of legislation, and the courts may take judicial notice of the history of the times when they were enacted. Village of North Fargo v. City of Fargo, 49 N.D. 597, 192 N.W. 977.

The statutes to which I have referred in this concurrence were first enacted by the territorial legislature. When North Dakota became a State, these statutes were adopted without change in meaning by the State. Considering the history of the statutes on the subject matter and also considering the Federal statute on surveys quoted above, as well as the Federal decisions cited herein, it is clear to this writer that the statutes were adopted upon the principle of natural justice that one who sustains the burden of losses and of repairs imposed by the contiguity of water ought to receive whatever benefits they may bring by accretion. The legislative intent of the territorial legislature is further clarified when I consider the Organic Law—Act of March 2, 1861, Chapter 86, 12 Statutes at Large 239. Section 1851 provided:

"The legislative power of every Territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States. But no law shall be passed interfering with the primary disposal of the soil; * * *."

Section 1925 provided:

"In addition to the restrictions upon the legislative power of the Territories, contained in the preceding chapter, section eighteen hundred and fifty-one, the legislative assemblies of Colorado, Dakota, and Wyoming shall not pass any law impairing the rights of private property, * * *."

It would be incongruous to reason that the territorial legislature enacted the law on accretion on the premise that governmental subdivisions bounded by governmental survey lines on all four sides, whether owned by the United States or patented and privately owned, could be lost to the territory by the encroachment thereon by a navigable river.

It is also significant that no statute, either territorial or State, was enacted providing that erosion of the banks of a navigable stream conveys the title to the soil remaining below the surface of the water in eroded areas to the sovereign. The only basis upon which the theory that the submerged lands below the low watermark passes by operation of law to the State, when the banks are eroded and washed away by action of the water, is the Federal law on surveys cited herein that the boundary line of fractional lots shall be ascertained by running them from established corners to the watercourse. This is a rule of property and we cannot by judicial fiat establish another rule which would violate the supreme law of the land.

Thus it is clear to this writer that Section 47–06–05, N.D.C.C., which provides that where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, was enacted by way of indemnity to the fractional lot owner bordering upon a stream for losses which he might suffer by action of the stream; and that Section 47–06–06, N.D.C.C., provides the fractional lot owner an opportunity for indemnity in the event a portion of his land should be lost as a result of avulsion occurring where the land taken by the stream is identifiable. Where, however, subdivisions are bounded on all four sides by government subdivision lines and are remote lands, the statute,

Section 47–06–05, supra, is not applicable. The owner of such a governmental subdivision continues to own the land below the water where the stream, either by erosion or avulsion, comes upon his land, subject however to the Federal reservation of control and use for the purpose of commerce. Therefore, when the stream changes its course, the easement follows the geographical area occupied by the streams but when the lands are built up again as the stream changes its course back to the original bed, the governmental easement over the geographical area temporarily occupied is lost because the easement follows the course of the stream. In other words, when lands are taken by a navigable stream which were not riparian at the time of the original survey but were remote and identifiable by governmental subdivision lines on all four sides thereof, the owner of such lands is owner in fee and has a right to the surface and to everything permanently situated beneath or above it (Section 47–01–12, N.D.C.C.), and when the navigable stream moves over onto such lands, he still owns it but it becomes subject to the Federal government's easement to the use and control of the waters for commerce and navigation. He does not lose title or ownership to the bed within the governmental subdivision occupied by the stream but the submerged land is subject to the easement. When the stream again changes its course and the lands are restored, the burden of easement is relieved and he does not acquire the restored lands beyond the governmental subdivision line as establish by the survey, whether it be restored by accretion or otherwise.

This reasoning is in harmony with former cases decided by this court. The land and geographical area involved in Oberly v. Carpenter, supra, cited in the majority opinion, involved only fractional subdivisions which bordered upon the stream at the time of the original survey and the admission of the State into the Union. In Hogue v. Bourgois, N.D., 71 N.W.2d 47, the lands were also fractional lots bordering upon the stream and Syllabus No. 3 of such case which reads:

"As patented lands riparian to a navigable stream are eroded and washed away by the action of the water and become submerged below low water mark the title to such submerged lands passes by operation of law to the State of North Dakota."

is applicable, as it was applied in that case, only to the fractional lots bounded on one side by the stream. The accretion to the island and the rights thereto were commensurate and equal with those of the riparian owner because both owners were riparian and, therefore, Section 47–06–05, N.D.C.C., applied. See Waldner v. Blachnik, 65 S.D. 449, 274 N.W. 837.

The title to the lands under navigable waters received by the State as an incident of sovereignty can be disposed of by the State, subject however to the rights of the public in such waters and to the paramount power of Congress to control navigation as far as may be necessary for the regulation of commerce. Our State has elected, by the enactment of the statutes on accretion and avulsion referred to above, to permit the disposal of such title in the interests of natural justice, subject however to the rights of the public in the waters and the power of Congress to control navigation so far as may be necessary.

STRUTZ, J., concurs.

BURKE, Judge (dissenting).

Concededly the decision of the majority in this case is contrary to the weight of case law in the United States. In Corpus Juris Secundum it is stated:

"Where a tract of land originally not contiguous to a stream or other navigable body of water becomes so through the gradual washing away of an intervening tract so that the boundary line is destroyed, the rule which

appears to be more commonly accepted is that such tract becomes riparian and is entitled to accretions, even though they extend over the location of the former boundary line." 65 C.J.S. Navigable Waters § 87, p. 189.

Were the weight to be given to case law the only guide to decision in this case, I might well agree that the minority rule is better reasoned and, in most circumstances, more conducive to the promotion of justice. In my view, however, "the rule which appears to be more commonly accepted" has been adopted by statute in this State.

Section 47–06–05 NDCC provides:

"Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

This statute has been the law of Dakota Territory and the State of North Dakota at least since 1870. In my opinion, the language of the statute is clear and unambiguous. It states unequivocally that accretions to the bank of a stream belong to the owner of the bank. The statute contains no words of limitation, restriction or qualification. It is not concerned with how or when the owner of the bank becomes the owner of the bank, and in my opinion it applies to an owner who becomes such by having the stream encroach upon land to which he has title as well as to those who acquire ownership of the bank of a stream in any other way.

I see no basis upon which to found a judicial modification of the clear language of this statute.

### On Petition for Rehearing.

**ERICKSTAD, Judge.**

A petition for rehearing has been filed in this case. It presents nothing that was not theretofore presented and argued by counsel or considered by this court. The petition is therefore denied.

STRUTZ and TEIGEN, JJ., concur.